[Cite as *Hanneman Family Funeral Homes & Crematorium v. Orians*, 2022-Ohio-984.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

HANNEMAN FAMILY FUNERAL
HOME AND CREMATORIUM,

    PLAINTIFF-APPELLANT/            CASE NO. 1-21-05
    CROSS-APPELLEE,

    v.

PATRICK ORIANS, ET AL.,

                        **O P I N I O N**

    DEFENDANTS-APPELLEES/
    CROSS-APPELLANTS.

Appeal from Allen County Common Pleas Court
Trial Court No. CV 2020 0021

**Judgment Affirmed**

**Date of Decision: March 28, 2022**

**APPEARANCES:**

    *Aaron L. Bensinger and Christopher A. Jackson* **for Appellant**

    *J. Alan Smith and Dalton J. Smith* **for Appellees**

Case No. 1-21-05

**ZIMMERMAN, P.J.**

{¶1} Plaintiff-appellant/cross-appellee, Hanneman Family Funeral Home and Crematorium ("Hanneman"), appeals the judgment of the Allen County Court of Common Pleas dismissing its claims for tortious interference with contracts and business relationships and trade-secret violations against the defendants-appellees/cross-appellants, Patrick Orians ("Orians") and Chiles-Laman Funeral & Cremation Services ("Chiles-Laman") (jointly as "cross-appellants"), its claims against Orians for conversion and defamation, and its claim against Chiles-Laman for ratification.[1]

{¶2} Cross-appellants appeal the trial court's decision on Hanneman's trade-secret violations as well as the trial court's dismissal of its claim for conversion against Hanneman. For the reasons that follow, we affirm the judgment of the trial court.

{¶3} This genesis of this case is Hanneman's "asset only" purchase of several funeral homes from Service Corporation International, Inc. ("SCI") that included Siferd-Orians Funeral Home ("Siferd-Orians") in Lima, Allen County, Ohio ("the Lima facility"). Orians (a 33-year employee of Siferd-Orians) ended his employment with Siferd-Orians on the day Hanneman purchased the Lima facility. Thereafter, Orians was hired by a competitor-funeral home in Lima, Chiles-Laman.

---

[1] Chiles-Laman is correctly identified as T.R. Chiles & Sons-Laman, Inc. dba Chiles-Laman Funeral & Cremation Services. (Doc. Nos. 1, 4, 6, 7); (Laman Depo. at 21-22, Doc. No. 129).

After acquiring his new position at Chiles-Laman, and while Hanneman was applying for a change in ownership for the Lima facility, Orians wrote and mailed letters to preneed-funeral-contract customers of the former Siferd-Orians Funeral Home on Chiles-Laman letterhead. Ultimately, many preneed customers transferred their preneed-funeral contracts to Chiles-Laman.

{¶4} On January 14, 2020, Hanneman filed a complaint in the trial court against cross-appellants. (Doc No. 1). Hanneman's complaint alleged claims for tortious interference with a business relationship and for conversion. (*Id*.). Hanneman also requested injunctive relief. (*Id.*).

{¶5} On February 11, 2020, cross-appellants filed an answer and three counterclaims against Hanneman for injunctive relief, declaratory judgment, and conversion. (Doc. No. 5). Thereafter, cross-appellants filed an amended answer, which included additional counterclaims (for trespass to chattels and tortious interference with business relationships and contracts against Hanneman) as well as a motion for a temporary restraining order ("TRO"). (Doc. Nos. 8, 9). The trial court denied cross-appellants' motion for a TRO on March 10, 2020. (Doc. No. 13).

{¶6} On March 20, 2020, Hanneman filed an answer to cross-appellants' counterclaims and requested leave to file an amended complaint. (Doc. Nos. 14, 20). The trial court granted leave and the amended complaint was filed on June 2, 2020, which included all the preceding claims plus claims for tortious interference

with contracts and trade-secret misappropriation against cross-appellants; a claim for defamation against Orians; and a claim for ratification against Chiles-Laman. (Doc. Nos. 57, 58).

{¶7} Thereafter, and on August 7, 2020, Hanneman filed a motion to compel discovery responses to its request for interrogatories and production of documents, which was opposed by cross-appellants. (Doc. Nos. 77, 80, 82, 83). The trial court denied Hanneman's motion on September 15, 2020. (Doc. No. 87).

{¶8} On August 21, 2020, cross-appellant's filed a motion for summary judgment as to all seven of Hanneman's claims against cross-appellants. (Doc. No. 79). Hanneman filed a memorandum in opposition to cross-appellants motion for summary judgment on November 20, 2020. (Doc. No. 119). On December 10, 2020, Hanneman requested leave of court to file a *partial* motion for summary judgment that cross-appellants opposed. (Doc. Nos. 135, 139, 140). Hanneman sought *partial* summary judgment as to its tortious interference with contracts and business relationships (Am. Compl. Cts. 1 & 2) and its trade-secret misappropriation claims (Am. Compl. Ct. 4) against cross-appellants, and its defamation claim (Am. Compl. Ct. 6) against Orians. The trial court granted Hanneman leave of court to file its motion on December 15, 2020. (Doc. No. 138).

{¶9} On February 8, 2021, the trial court granted summary judgment in favor of cross-appellants and denied Hanneman's motion for partial summary judgment

as to all of Hanneman's claims *except* injunctive relief.  (Doc. No. 142).  The trial

court also granted summary judgment in favor of Hanneman as to cross-appellants'

conversion claim against Hanneman.[2]  (*Id.*).  The trial court then determined that

there is "no just reason for delay" and certified the judgment entry as final and

appealable under Civ.R. 54(B).

**{¶10}** Hanneman filed its notice of appeal on February 9, 2021 raising the

following five assignments of error for our review.

**Assignment of Error No. I**

**The Trial Court Incorrectly Dismissed Appellant's Claim For Trade Secret Violations And Incorrectly Denied Appellant's Summary Judgment Motion On Appellant's Claim For Trade Secret Violations.**

**Assignment of Error No. II**

**The Trial Court Erred By Denying Appellant's Motion To Compel Discovery.**

**Assignment of Error No. III**

**The Trial Court Erred By Dismissing Appellant's Claim For Tortious Interference With Business Contracts, Business Relations And Conversion By Appellees.**

**Assignment of Error No. IV**

**The Trial Court Erred By Dismissing Appellant's Claim For Ratification.**

---

[2] All of cross-appellant's other claims (i.e., injunctive relief, declaratory judgment, trespass to chattels, and tortious interference with contracts and business relationships) survived summary judgment.  (Doc. No. 142).

## Assignment of Error No. V

**The Trial Court Erred By Dismissing Appellant's Claim For Defamation.**

{¶11} On February 23, 2021, cross-appellants filed a notice of cross-appeal, and cross-appellants raise the following two assignments of error for our review.

## Cross-Assignment of Error No. I

**The Trial Court Erred When It Failed to Hold That Appellant/Cross-Appellee's Common Law Tort Claims Were Not Preempted By Its Ohio Uniform Trade Secret Act Claim.**

## Cross-Assignment of Error No. II

**The Trial Court Erred When It Entered Summary Judgment on Appellee/Cross-Appellant's Claim of Conversion as Neither Party Moved for Summary Judgment on the Claim.**

{¶12} We will begin by addressing Hanneman's second assignment of error followed by his first, third, and fifth assignments of error together with cross-appellants first and second cross-assignments of error. We will address Hanneman's fourth assignment of error last.

*Hanneman's Appeal*

## Assignment of Error No. II

**The Trial Court Erred By Denying Appellant's Motion To Compel Discovery.**

{¶13} In his second assignment of error, Hanneman asserts that the trial court erred by denying his motion to compel discovery. Specifically, he argues that were

he permitted to gain more information (through discovery) his common-law-tort-claims would not have been dismissed.

*Standard of Review*

**{¶14}** "'A decision to grant or deny a discovery motion rests within the sound discretion of the trial court.'" *Zellner v. Prestige Gardens Rehabilitation and Nursing Center*, 3d Dist. Union No. 14-18-14, 2019-Ohio-595, ¶ 46, quoting *Alford v. Arbors at Gallipolis*, 4th Dist. Gallia No. 17CA11, 2018-Ohio-4653, ¶ 70. "'The trial court has discretion to manage the discovery process.'" *Id.*, quoting *Alford* at ¶ 70, citing *State ex rel. Daggett v. Gessaman*, 34 Ohio St.2d 55 (1973). The abuse-of-discretion standard suggests the trial court's decision is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

*Analysis*

**{¶15}** Before we review the merits of this argument, we must address whether the issue is reviewable by this court as a final, appealable order.

**{¶16}** We have appellate jurisdiction over "final appealable orders." Ohio Constitution, Article IV, Section 3(B)(2). *See Grieshop v. Hoyng*, 3d Dist. Mercer No. 10-06-27, 2007-Ohio-2861, ¶ 15. "If an order is not final and appealable, the appellate court lacks jurisdiction, and the appeal must be dismissed." *Dunham v. Ervin*, 10th Dist. Franklin No. 17AP-79, 2017-Ohio-7616, ¶ 10. "'An order of a court is a final appealable order only if the requirements of both R.C. 2505.02 and,

if applicable, Civ.R. 54(B), are met.'" *CitiMortgage, Inc. v. Roznowski*, 139 Ohio St.3d 299, 2014-Ohio-1984, ¶ 10, quoting *State ex rel. Scruggs v. Sadler*, 97 Ohio St.3d 78, 2002-Ohio-5315, ¶ 5.

**{¶17}** Hanneman's second assignment of error derives from the trial court's certification of its judgment pursuant to Civ.R. 54(B) and now is seeking to have us review the trial court's denial of his motion to compel under this assignment of error. Generally speaking, a motion to compel discovery is interlocutory in nature, and typically, is not a final, appealable order. *See, e.g., Block Communications, Inc. v. Pounds*, 6th Dist. Lucas No. L-13-1224, 2015-Ohio-2679, ¶ 32. There are exceptions to this general rule when alleged trade secrets are at issue. *See id.* Important to the discussion, cross-appellants never asserted that the information Hanneman sought from Chiles-Laman involved trade secrets; only Hanneman did. (Doc. Nos. 77, 80, 82, 83). Nonetheless, cross-appellants' argued that the information sought is proprietary-business information.

**{¶18}** Hence, if the trial court's judgment overruling the motion to compel was the sole decision Hanneman sought to appeal, this court would have no choice, but to conclude that the merits of that ruling are not properly before us. However, under the facts presented and because the trial court entered its final judgment as to Hanneman's common-law tort claims, we conclude that the trial court's order denying Hanneman's motion to compel *merged* into the trial court's final judgment

on summary judgment as to his common-law-tort claims. Consequently, Hanneman is entitled to contest the merits of the trial court's ruling on his motion to compel within the context of this appeal. Accordingly, we conclude we have jurisdiction to review Hanneman's second assignment of error.

*Analysis*

**{¶19}** According to our review of the record, Hanneman's counsel filed a motion requesting an order compelling the cross-appellants to comply with the following requests:

> (1)   Identification of electronic and cloud storage devices;
>
> * * *
>
> (2)   Identification and production of all documents related to any and all preneed contracts from 2009 to present;
>
> * * *
>
> (3)   The employment contract and compensation of Defendant Patrick Orians.
>
> * * *

(Doc. No. 77).

**{¶20}** In its motion to compel, Hanneman argued that the information in the Chiles-Laman's electronic and cloud-storage devices was needed because cross-appellants had not produced correspondence, emails, letters or documents as it related to the preneed contracts. (*Id.*). Hanneman argued that it needed access to

*10 years* of Chiles-Laman's preneed-customer lists to determine whether there were additional friends, family members, or spouses who *may* have transferred their preneed files to Chiles-Laman. (*Id.*). Finally, Hanneman asserted that he needed access to Orian's compensation with Chiles-Laman to determine if Orians was incentivized to provide Chiles-Laman with the preneed contracts, and whether Chiles-Laman was aware of its value. (*Id.*)

{¶21} Cross-appellants argued that Hanneman already possessed the relevant preneed contracts and files, an authorization for each transfer requested, and a complete copy of the letters Orians sent to former customers. (Doc. No. 80). Additionally, cross-appellants assert that the requested colleagues, family members, and friends list is too speculative because those individuals may have never been customers of Siferd-Orians (and thus its successor Hanneman) in the first instance. Lastly, cross-appellants asserted that Orians's compensation structure is irrelevant since nothing prohibits Chiles-Laman from hiring Orians *specifically* for his ability to obtain preneed transfers of former customers. (Doc. No. 80).

{¶22} In its ruling denying the motion to compel, the trial court considered that certain documents were already in Hanneman's possession; what was relevant to Hanneman's claims in the amended complaint; the proportional needs of the case; the parties' access to relevant information; the parties' resources; and whether the

expense of the proposed discovery request outweighed its likely benefit. (Doc. No. 87).

{¶23} On appeal, Hanneman argues that the trial court erred by overruling its motion to compel the production of the documents, information, and lists requested because those items were needed for damages calculations since common-law-tort claims were dismissed by the trial court. We disagree.

{¶24} In reviewing the trial court's decision and the record before us, we conclude that Hanneman failed to demonstrate that the trial court abused its direction by denying its motion to compel discovery. The trial court determined that Hanneman already had access to *all relevant information* (Hanneman's preneed customers' contracts and files, the transfer authorizations from the customers, and a complete copy of the letters sent out by Orians on Chiles-Laman letterhead) as it pertained to its claims. *See Byrd v. Lindsay Corporation*, 9th Dist. Summit No. 29491, 2020-Ohio-3870, ¶ 13, quoting *Martin v. The Budd Co*., 128 Ohio App.3d 115, 119 (9th Dist.1998), citing *Manofsky v. Goodyear Tire & Rubber Co.*, 69 Ohio App.3d. 663, 668 (9th Dist.1990) (observing that "discovery proceedings may not be used to conduct a mere fishing expedition for incriminating evidence", and concluding that "those documents were not relevant to the litigation"). Hence, we do not conclude that the trial court abused its discretion by denying Hanneman's motion to compel discovery.

**{¶25}** Accordingly, Hanneman's second assignment of error is overruled.

**Assignment of Error No. I**

**The Trial Court Incorrectly Dismissed Appellant's Claim For Trade Secret Violations And Incorrectly Denied Appellant's Summary Judgment Motion On Appellant's Claim For Trade Secret Violations.**

**Assignment of Error No. III**

**The Trial Court Erred By Dismissing Appellant's Claim For Tortious Interference With Business Contracts, Business Relations And Conversion By Appellees.**

**Assignment of Error No. IV**

**The Trial Court Erred By Dismissing Appellant's Claim For Ratification.**

**Assignment of Error No. V**

**The Trial Court Erred By Dismissing Appellant's Claim For Defamation.**

**Cross-Assignment of Error No. I**

**The Trial Court Erred When It Failed to Hold That Appellant/Cross-Appellee's Common Law Tort Claims Were Not Preempted By Its Ohio Uniform Trade Secret Act Claim.**

**Cross-Assignment of Error No. II**

**The Trial Court Erred When It Entered Summary Judgment on Appellee/Cross-Appellant's Claim of Conversion as Neither Party Moved for Summary Judgment on the Claim.**

**{¶26}** In its remaining assignments of error, Hanneman argues that the trial court erred by granting summary judgment in favor of cross-appellants as to all of

its claims *except* injunctive relief. Cross-appellants argue that the trial court erred by failing to preempt Hanneman's common-law-tort claims under Ohio's Uniform Trade Secrets Act ("OUTSA") and by entering summary judgment on cross-appellants' conversion claim even though neither party moved for summary judgment on that claim.

*Standard of Review*

{¶27} We review a decision to grant summary judgment de novo. *Doe v. Shaffer*, 90 Ohio St.3d 388, 390 (2000). "De novo review is independent and without deference to the trial court's determination." *ISHA, Inc. v. Risser*, 3d Dist. Allen No. 1-12-47, 2013-Ohio-2149, ¶ 25, citing *Costner Consulting Co. v. U.S. Bancorp*, 195 Ohio App.3d 477, 2011-Ohio-3822, ¶ 10 (10th Dist.). Summary judgment is proper where there is no genuine issue of material fact, the moving party is entitled to judgment as a matter of law, and reasonable minds can reach but one conclusion when viewing the evidence in favor of the non-moving party, and the conclusion is adverse to the non-moving party. Civ.R. 56(C); *State ex rel. Cassels v. Dayton City School Dist. Bd. of Edn.*, 69 Ohio St.3d 217, 219 (1994).

{¶28} "The party moving for summary judgment has the initial burden of producing some evidence which demonstrates the lack of a genuine issue of material fact." *Carnes v. Siferd*, 3d Dist. Allen No. 1-10-88, 2011-Ohio-4467, ¶ 13, citing *Dresher v. Burt*, 75 Ohio St.3d 280, 292 (1996). "In doing so, the moving party is

not required to produce any affirmative evidence, but must identify those portions of the record which affirmatively support his argument." *Id.*, citing *Dresher* at 292. "The nonmoving party must then rebut with specific facts showing the existence of a genuine triable issue; he may not rest on the mere allegations or denials of his pleadings." *Id.*, citing *Dresher* at 292 and Civ.R. 56(E).

**{¶29}** Material facts are those facts "that might affect the outcome of the suit under the governing law." *Turner v. Turner*, 67 Ohio St.3d 337, 340 (1993) citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505 (1986). "Whether a genuine issue exists is answered by the following inquiry: [d]oes the evidence present 'a sufficient disagreement to require submission to a jury' or is it 'so one-sided that one party must prevail as a matter of law[?]'" *Id.*, citing *Anderson* at 251-252.

*Trade-secret-Misappropriation Claims*

**{¶30}** In his first assignment of error, Hanneman argues that the trial court erred by granting summary judgment as to his trade-secret-misappropriation claims against cross-appellants on the basis that a genuine issue of material fact exists as to whether Hanneman's *files* constituted a trade secret under OUTSA; whether Orians misappropriated trade-secrets by copying and using the *files* to solicit business for Chiles-Laman; and whether Chiles-Laman also misappropriated a

trade-secret by knowingly using the trade-secret, which was acquired through improper means.

**{¶31}** In order to prevail on trade-secret-misappropriation claim, Hanneman must establish: (1) the existence of a trade secret; (2) the acquisition of a trade secret as a result of a confidential relationship; and (3) the unauthorized use of a trade secret. *Heartland Home Fin., Inc. v. Allied Home Mortg. Capital Corp.*, 258 Fed.Appx. 860, 861 (6th Cir.2008) (interpreting R.C. 1333.61-1333.69). Under OUTSA, Hanneman may recover damages from cross-appellants if it can establish that Orians and Chiles-Laman misappropriated its trade secrets. *See Kendall Holdings, Ltd. v. Eden Cryogenics*, LLC, 521 Fed.Appx. 453, 457 (6th Cir.2013). OUTSA defines misappropriation in the following ways:

> (1)  Acquisition of a trade secret of another by a person who knows has reason to know that the trade secret was acquired by improper means;
>
> (2)  Disclosure or use of a trade secret of another without the express or implied consent of the other person by a person who did any of the following:
>
> (a) Used improper means to acquire knowledge of the trade secret;
>
> (b)  At the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret that the person acquired was derived from or through a person who had utilized improper means to acquire it, was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or was derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use;

(c)   Before a material change of their position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

R.C. 1333.61(B)(1)-(2)(a)-(c).   *See Kendall Holdings, Ltd.* at 456, citing R.C. 1333.61(B).   "'Improper means' includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." R.C. 1333.61(A).   *See Kendall Holdings, Ltd.* at 457, citing R.C. 1333.61(A).

{¶32} Ultimately, Hanneman's assignment of error hinges on two questions: 1) what information did Orians obtain *prior* to the end of his employment relationship with SCI, and 2) whether that information was (in fact) a trade secret. Because it is dispositive of the issue before us, we will begin by addressing those questions ultimately to determine whether Hanneman's trade-secret-misappropriation claims involve a trade secret.

{¶33} Under OUTSA, a trade secret is defined to mean:

*information, including the whole or any portion* or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or *listing of names, addresses, or telephone numbers*, that satisfies both of the following:

(1)   It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

> (2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

(Emphasis added.) R.C. 1333.61(D). *See State ex rel. The Plain Dealer v. Ohio Dept. of Ins.*, 80 Ohio St.3d 513, 524, 1997-Ohio-75, *superseded by statute on other grounds as stated in*, *State ex rel. Bressler v. Ohio State Univ.*, 89 Ohio St.3d 517-518 (1997). The Supreme Court of Ohio recognized certain factors to consider when analyzing a trade-secret claim:

> The extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, i.e., by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information.

*State ex rel. The Plain Dealer* at 524-525. A business or possessor must take some active steps to maintain its secrecy of a potential trade secret in order to enjoy presumptive trade-secret status. *Id.* at 525, citing *Water Mgt., Inc. v. Stayanchi*, 15 Ohio St.3d 83, 85-86 (1984). Moreover, the burden to identify and demonstrate that the material is included in categories of protected information under the statute falls upon Hanneman in asserting trade-secret status. *Id.*, citing *Amoco Prod. Co. v. Laird*, 622 N.E.2d 912 (Ind. 1993). Here, Hanneman based its trade-secret-misappropriation claims on Orians's purported theft of the preneed customer *contracts and client information* from the Siferd-Orians files.

*Orians attainment of preneed customer information*

**{¶34}** Importantly, Hanneman's "asset only" purchase of Siferd-Orians from SCI on August 1, 2019 included:

> (v)  All preneed funeral merchandise and/or service agreements generated in the operation of the Business that have not yet been cancelled, transferred or fully serviced as the Effective Time (the "Preneed Agreements"), including contract and accounts receivable associated therewith;

(Doc. No. 134, Cross-appellants Ex. L).  In addition to the preneed-service agreements, Siferd-Orians maintained files associated with each preneed customer. (*See* Orians Depo. at 101-102, 169-168).  Amongst other things, each Siferd-Orians' preneed-customer file included a client-information sheet ("CIS") containing the name and address of that specific preneed customer.  (Orians Depo. at 169).

**{¶35}** After meeting with the Hanneman's and *prior* to the asset-only sale, Orians discovered he was being replaced as funeral director of the Lima facility. (Kr. Hanneman Depo. at 143-144); (Orians Depo. at 166).  Moreover, Orians was notified by his direct supervisor (Beth Wagner) that he would not be retained by Hanneman.  (Orians Depo. at 156, 166-167); (Sizemore Depo. at 73).  (*See* Doc. No. 79, Ex. D, Orians Aff. at 2, ¶ 15, 16).  Thereafter, Orians "copied" the CIS (containing the preneed customer's name and address) from each file for customers with whom he had a "relationship" (i.e., family members, friends, and colleagues). (Orians Depo. at 167-169, 172, 198, 205).  While it is not exactly clear what

information Orians "copied", Hanneman testified at his deposition that Orians "copied" the preneed *contract* information to get the *names* of preneed customers. (Kr. Hanneman Depo. 169-172, 188, 192-195, 285). However, Hanneman conceded that he did not see Orians "copy" any files. (Kr. Hanneman Depo. 189, 192-195, 285).

{¶36} After learning that he would not be hired by Hanneman, Orians testified that he contacted Gary Kill at Chiles-Laman to let him know that he was looking for a job. (Kill Depo. at 62, 75-78); (Orians Depo. at 172). Thereafter, Orians was interviewed and ultimately offered a position with Chiles-Laman based on his credentials, longevity in the community, and likeability. (Laman Depo. at 54-68); (Orians Depo. at 174-175). Importantly, Orians never discussed the preneed contracts during his interview nor was his compensation package tied to the acquisition of Hanneman's preneed customers. (Kr. Hanneman Depo. at 285); (Kill Depo. at 86); (Laman Depo. at 91-94); (Orians Depo. at 178, 186).

{¶37} Just prior to the sale of the funeral home, Orians received a severance package from Siferd-Orians that included a confidentiality agreement. (Orians Depo. at 122, 199-201). Pursuant to the terms of the severance package, Orians destroyed the information he "copied" from Siferd-Orians files. (Orians Depo. at 199). (*See* Laman Depo. at 103). However, after assuming his new position at Chiles-Laman, Orians sent out letters (on Chiles-Laman letterhead) to some preneed

customers of his previous employer. (Laman Depo. 109-114); (Doc. No. 79, Ex. D, Orians Aff. at 3, ¶ 22); (Orians Depo. at 178-188, 198). Orians testified that the letters were generated based upon his memory and not the CIS. (Orians Depo. at 198-199).

**{¶38}** The trial court determined as a matter of law that the *information* Orians "copied" was not a trade secret because Hanneman failed to satisfy the first prong of the statute (i.e., that the information was not "readily ascertainable by proper means[,] by other persons"). (Doc. No. 142). *See* R.C. 1333.61(D)(1). *See also State ex rel. The Plain Dealer*, 80 Ohio St.3d at 524.

**{¶39}** Indeed, on August 28, 2019, Hanneman submitted (with its change-in-ownership application to the Ohio Board of Embalmers and Funeral Directors, a report generated by the American Memorial Life Insurance Company ("AMLIC"), that included a list of the active and inactive preneed-contract policies for the former Siferd Orians Funeral Home.[3] (*See* Doc. No. 119, Def. Ex. 2, Williams Aff. ¶ 3); (Doc. No. 124, Sealed Ex. F). Cross-appellants obtained a copy of Hanneman's application (including the AMLIC report) through a public-record request. The report contained a total of 238 preneed contracts from Siferd-Orians.[4] (*Id.*). The

---

[3] This report included significantly more information than the CIS. Specifically, it included the policy, name, plan description, issue date, face amount, current death benefit, total premiums paid, total disbursements, total loan activity, status, and term dates for all the preneed customers. (Doc. No. 124, Sealed Ex. F).

[4] Since this appeal was filed, R.C. 149.43 (was amended by 2021 Am.Sub.H.B. No. 110, 2021 Ohio Laws File 30, *effective* September 30, 2021 to April 28, 2022) excluding "[a] preneed funeral contract, as defined in section 4717.01 * * * and contract terms and personally identifying information of a preneed funeral contract, that is contained in a report submitted by or for a funeral home to the board of embalmers and

information obtained in this report also included similar information contained in the CIS forms, the *names of the preneed customers*. (*See id.*).

{¶40} Thus, under the specific facts and circumstances of this case, we agree with the trial court and conclude that the *information* "copied" by Orians from the CIS form did not constitute a trade secret. Accordingly, Hanneman's trade-secret-misappropriation claims are without merit.

{¶41} Consequently, and based on our conclusion that the information "copied" and later destroyed by Orians did not constitute a trade secret under R.C. 1333.61(D), we conclude that there is no genuine issue of material fact that cross-appellants misappropriated *any* trade secrets. Therefore, the trial court could not err by granting summary judgment in favor of cross-appellants as to Hanneman's trade-secret-misappropriation claims.

{¶42} Cross-appellants allege in their first cross-assignment of error that the trial court erred by determining that the Hanneman's tort claims were not preempted by OUTSA under R.C. 1333.67(A). As a result of our conclusion (under Hanneman's first assignment of error as to its trade-secret-misappropriation claims) that the *information* "copied" by Orians is not a trade secret, Hanneman's common-

---

funeral directors under division (C) of section 4717.13, division (J) of section 4717.31, or section 4717.41" from the definition of a "[p]ublic record" under R.C. 149.43(A)(1). R.C. 149.43(A)(1)(nn) (Sept. 30, 2020-Apr. 28, 2022). *Compare with* R.C. 149.43(A)(1) (Apr. 8, 2019-Oct. 16, 2019) (containing no previous exclusion for preneed funeral contracts, terms, and personally identifying information and the required report from the definition of a public record).

law-tort claims cannot be displaced. Accordingly, we conclude that the cross-appellants first cross-assignment of error is also without merit. Therefore, the trial court did not err by overruling the summary judgment request.

**{¶43}** Accordingly, Hanneman's first assignment of error and cross-appellants' first cross-assignment of error are overruled.

*Common-Law-Tort Claims*

**{¶44}** In its third assignment of error, Hanneman asserts that the trial court erred by granting summary judgment in favor of cross-appellants as to its common-law-tort claims because the trial court determined that there were no genuine issues of material fact as to damages. Specifically, Hanneman argues that cross-appellants tortuously interfered with its (recently acquired) preneed contracts and business relationships, and that, Orians wrongfully exercised dominion over the CIS form contained within each preneed file.

*Tortious Interference with Contracts & Business Relationships:*

**{¶45}** A tortious interference with a contract ensues "when a person, without a privilege to do so, induces or otherwise purposely causes a third person * * * not to perform a contract with another." *Gentile v. Turkoly*, 7th Dist. Mahoning No. 16 MA 0071, 2017-Ohio-1018, ¶ 23, quoting *A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 73 Ohio St.3d 1, 14 (1995); *Total Quality Logistics, LLC v. Alliance Shippers, Inc.*, 12th Dist. Clermont No.

CA2020-06-031, 2021-Ohio-781, ¶ 78. The elements of tortious interference with a contract are:

> 1) the existence of a contract, 2) the defendant's knowledge of a contract, 3) the defendant's intentional procurement of the contract's breach, 4) the lack of justification, and 5) the resulting *damages* from that breach.

(Emphasis added.) *Id.*, citing *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 85 Ohio St.3d 171 (1999), paragraph one of the syllabus.

**{¶46}** Conversely, "[t]he tort of interference with a business relationship occurs when a person, without privilege to do so, induces or otherwise purposefully causes a third person not to enter into or continue a business relationship with another." *Id.* at ¶ 24, quoting *DK Prods., Inc. v. Miller*, 12th Dist. No. CA2008-05-060, 2009-Ohio-436, ¶ 9, citing *Diamond Wine & Spirits, Inc. v. Dayton Heidelberg Dist. Co.*, 148 Ohio App.3d 596, 2002-Ohio-3932, ¶ 23 (3rd Dist.). The elements of this tort are:

> (1) the existence of a prospective business relationship; (2) the wrongdoer's knowledge thereof; (3) an intentional interference causing a breach or termination of the relationship; and (4) *damages* resulting therefrom.

(Emphasis added.). *Id.*, citing *First-Knox Natl. Bank v. MSD Properties, Ltd.*, 5th Dist. Knox No. 15CA6, 2015-Ohio-4574, ¶ 19. "Tortious interference with a business relationship does not require the breach of contract, rather it is sufficient to prove that a third party does not enter into or continue a business relationship

with the plaintiff." *Id.*, citing *Magnum Steel & Trading, LLC v. Mink*, 9th Dist. Nos. 26127 and 26231, 2013-Ohio-2431, ¶ 10.

*Conversion:*

**{¶47}** Conversion is "the wrongful exercise of dominion over property to the exclusion of the rights of the owner, or withholding it from his possession under a claim inconsistent with his rights." *Joyce v. Gen. Motors Corp.*, 49 Ohio St.3d 93, 96 (1990). To prevail on a claim for conversion, a plaintiff must prove the following elements: (1) the plaintiff's ownership or right to possess the property at the time of the conversion; (2) the defendant's conversion by a wrongful act or disposition of plaintiff's property; and (3) *damages*. (Emphasis added.) *Kuvedina, LLC v. Cognizant Tech. Sol.*, 946 F. Supp. 2d 749, 761 (S.D. Ohio 2013), citing *Haul Trans. of VA, Inc. v. Morgan*, 2d Dist. Montgomery No. CA 14859, 1995 WL 328995, at *3 (June 2, 1995). "When a defendant to a conversion claim moves for summary judgment, the court should grant the motion if the plaintiff fails to produce evidence on any of" these three elements. *Minix v. Collier*, 4th Dist. Scioto No. 97CA2523, 1998 WL 154540, at *4 (Mar. 31, 1998).

**{¶48}** Because it is dispositive of all of Hanneman's common-law-tort claims, we need only address the element of damages. It is evident that a preneed contract has value. However, its value is dependent on a variety of factors such as, the age of the customer at the time the preneed contract is underwritten, whether the

preneed contract is unfunded or funded by a trust, insurance policy, or annuity[5], who ultimately provides the funeral services at-need, and inflation at the time the services are rendered. (Kr. Hanneman Depo. at 160-161, 169-170, 255); (Laman Depo. at 26-27, 35, 44-48); (Doc. No. 79, Ex. D, Orians Aff. at 2, ¶ 9, 10); (Orians Depo. at 39, 70). Here, Hanneman presented *no evidence* of its lost profits as to any of its common-law-tort claims. Further, deposition testimony reveals that the funeral home receives nothing from the preneed-contract formation. (Kr. Hanneman Depo. at 112, 160-161, 170). Rather, the funeral home receives funds at a *future* date "if we provide the service" because the funeral home is paid for the services that are effectuated at-need. (*Id.*).

{¶49} Even if one could determine the actual value of a preneed contract at any given point in time based on some of the variables listed above, the valuation is still speculative because it is subject to other variables such as inflation and portability (both of which impact the decline of the purchasers purchasing power in relation to the evolving prices of goods and (in this case) services for a particular period of time). Thus, any damage calculation is purely theoretical until the preneed funeral contract is actually realized when a preneed customer dies. (*See* Doc. No. 79, Appendices 1, 2, 3, 4, 5). *See also* R.C. 4717.01, 4717.31, 4717.32, 4717.34, 4717.35. Importantly, Hanneman failed to establish the element of damages.

---

[5] Importantly, all the preneed funeral contracts at issue under the facts before were funded by insurance. (Doc. No. 79, Ex. D, Orians Aff. at 2, ¶ 9).

{¶50} In cross-appellants' second cross assignment of error, they assert that the trial court erred by entering summary judgment on behalf of Hanneman as to their conversion claim when neither party had requested summary judgment as to their claim.

{¶51} Under certain circumstances, a trial court that denies a motion for summary judgment can grant summary judgment to the opposing party *even if* that party did not file a cross-motion for summary judgment. *Crum v. Yoder*, 7th Dist. Monroe No. 20 MO 0005, 2020-Ohio-5046, ¶ 25, citing *Salem Community Hosp. v. Sankovic*, 7th Dist. Columbiana No. 96-CO-91 (Dec. 31, 1997). The entry of summary judgment under Civ.R. 56 against the movant does not prejudice the movant's due process rights "where all the evidence material to the issue being litigated is before the court, and the record shows that no genuine issue as to any material fact exists and that the nonmoving party is entitled to judgment as a matter of law." *Houk v. Ross*, 34 Ohio St.2d 77 (1973), paragraph one of syllabus (upholding the appellate court's grant of summary judgment for the non-movant where all parties submitted material evidence to the court and the issue was sufficiently argued to show there existed no genuine issue as to any material fact). Notably, and like Hanneman, cross-appellants presented no evidence of any lost profits.

{¶52} Because of our determinations as to Hanneman's second assignment of error, and based on our de novo review of the record, there is no genuine issue of material fact that Hanneman or cross-appellants presented evidence of anything other than speculative damages as to their common-law-tort claims. Therefore, the trial court did not err by granting summary judgment in favor of cross-appellants as to Hanneman's tortious interference with contracts and business relationships and Orians as to Hanneman's conversion claim. Moreover, the trial court did not err by granting summary judgment in favor of Hanneman as to cross-appellants conversion claim.

{¶53} Therefore, Hanneman's third assignment of error and cross-appellants second cross-assignment of error are overruled.

*Defamation Claim*

{¶54} In his fifth assignment of error, Hanneman claims that the trial court erred by granting summary judgment in favor of Orians as to its defamation claim because the definition of "*force*" is false, and it does not have an innocent interpretation. In this case, Hanneman claimed that Orians defamed it by stating that Hanneman "*forced*" him to find new employment.

{¶55} The determination of whether words are defamatory is a question of law, and thus summary judgment is appropriate in defamation actions. *Heidel v. Amburgy*, 12th Dist. Warren No. CA2002-09-092, 2003-Ohio-3073, ¶ 11, citing

*Vail v. The Plain Dealer Publishing Co.*, 72 Ohio St.3d 279, 280, 1995-Ohio-187, *cert. denied*, 516 U.S. 1043, 116 S.Ct. 700 (1996). In order to survive summary judgment in an action involving defamation, "the plaintiff must make a sufficient showing of the existence of every element essential to his or her case." *Id.*

{¶56} "A defamatory statement expressed in a writing, a picture, a sign, or an electronic broadcast is considered libel." *Wilson v. Harvey*, 8th Dist. Cuyahoga No. 85829, 2005-Ohio-5722, ¶ 17. Because the facts before us involve writings, we must determine whether the defamatory statements are libelous. Libel is generally defined "as a false written publication, made with some degree of fault, reflecting injuriously on a person's reputation, or exposing a person to public hatred, contempt, ridicule, shame or disgrace, or affecting a person adversely in his or her trade, business or profession." *A & B-Abell Elevator Co., Inc.*, 73 Ohio St.3d at 7.

{¶57} To prevail on a libel claim, a plaintiff must prove five elements: "(1) a false and defamatory statement; (2) about plaintiff; (3) published without privilege to a third party; (4) with fault of at least negligence on the part of the defendant; and (5) that was either defamatory per se or caused special harm to the plaintiff." *Gosden v. Louis*, 116 Ohio App.3d 195, 206 (1996). *Jacobs v. Budak*, 11th Dist. Trumbull No. 2002-T-0088, 2004-Ohio-522, ¶ 50.

{¶58} "Libel per se means libel of itself, or upon the face of a publication, whereas libel per quod is libel by an interpretation, through an innuendo, between

an innocent or harmless meaning and a libelous one." *Becker v. Toulmin*, 165 Ohio St. 549, 556 (1956). "If a publication can by innuendo be construed to be either nonlibelous or libelous, the question may be submitted to a jury provided special damages have been pleaded and proved by the one claiming libel." *Id.* "There can be no maintenance of an action for libel per quod in the absence of proof of special damages." *Id.*

{¶59} Whether the statement is one of fact or of opinion is a question of law for the court to decide. *Heidel*, 2003-Ohio-3073, at ¶ 15, citing *Vail*, 72 Ohio St.3d at 281. In making this determination, the courts use a "totality of the circumstances" test. *Scott v. News-Herald*, 25 Ohio St.3d 243 (1986), paragraph one of the syllabus, *overruling*, *Milkovich v. News-Herald*, 15 Ohio St.3d 292 (1984); *Heidel* at ¶ 15, citing *Vail*, 72 Ohio St.3d at 281. This test comprises four parts: (1) the specific language used; (2) whether the statement is verifiable; (3) the general context within which the statement is made; and (4) the broader context within which the statement appeared. *Scott* at 250; *Heidel* at ¶ 15; *Vail* at the syllabus. "This analysis is not a bright-line test, but does establish parameters within which each statement or utterance may stand on its own merits rather than be subjected to a mechanistic standard." *Vail* at 282. This totality-of-the-circumstances test "'can only be used as a compass to show general direction and not a map to set rigid boundaries.'" *Id.*, quoting *Scott* at 250. "Furthermore, the

standard must be fluid. Every case will present facts that must be analyzed in the context of the general test. Each of the four factors should be addressed, but the weight given to any one will conceivably vary depending on the circumstances presented." *Id.* Additionally, "[a]ll four factors of Ohio's test for distinguishing a statement of fact from an opinion depend on the reasonable reader's perception of the statement–not on the perception of the publisher." *McKimm v. Ohio Elections Comm.*, 89 Ohio St.3d 139, 144 (2000), citing *Vail* at 282-283. Otherwise, the author could escape liability by advancing a harmless, subjective interpretation of the statements made. *Id.* at 145.

{¶60} However, since it is dispositive of Hanneman's fifth assignment of error, we will focus primarily on the first part of the test–the specific language used. In making a determination under this first part of the test, a court must consider whether the language used "'lacks precise meaning and would be understood by the ordinary reader for just what it is–one person's attempt to persuade public opinion.'" *Heidel* at ¶ 20, quoting *Vail* at 282-283. If the language is loosely definable or may be interpreted in various ways, that language will generally not support a cause of action for defamation. *Id.*, citing *Wampler v. Higgins*, 93 Ohio St.3d 111, 129 (2001). The main concern is with the common meaning of the statement. *Scott* at 250.

{¶61} Here, the record reveals that Orians sent out letters to former Siferd-Orians preneed customers. (Doc. No. 79, Def. Ex. D, Orians Aff. at ¶). Importantly, only about half of the letters involved the language cross-appellants argue is actionable as defamatory. (Doc. No. 79, Def. Ex. B); (Doc. No. 119, Pl. Ex. 35). Specifically, the language cross-appellants allege are defamatory statements in this case is that Orians was "*forced* to find new employment" when Siferd-Orians was sold to "an out of town owner". (Emphasis added.) (*Id.*); (*Id.*). Important to this discussion, some letters stated that Orians was "not retained" or "[his] employment came to an end". (*Id.*).

{¶62} Significantly, the trial court determined that as a matter of fact and law that Orians's statements were not false, and further, at the very least, his terminology was susceptible to an innocent interpretation. (Doc. No. 142). We agree.

{¶63} Here, Orians used the term "forced" as a transitive verb to mean that (he) was effected by the actions of Hanneman as evidenced by the variations he used in his written letters. Such wording is susceptible to innocent interpretation.

{¶64} Hence, there is no genuine issue of material fact that Orians' made false and defamatory statements about Hanneman in his (Orians) letters to Hanneman's preneed customers. Therefore, the trial court did not err by granting summary judgment in favor of Orians as to Hanneman's defamation claim.

{¶65} Accordingly, Hanneman's fifth assignment of error is overruled.

*Hanneman's Ratification Claim*

**{¶66}** Hanneman argues in its fourth assignment of error that the trial court erred by granting summary judgment on its ratification claim against Chiles-Laman for Orians's actions.

**{¶67}** "A principal ratifies the unauthorized act of his agent if the 'principal, with full knowledge of the facts, conducts himself in a way which manifests his intention to approve an earlier act performed by his agent which did not bind him.'" *Bailey v. Midwestern Ent., Inc.*, 103 Ohio App.3d 181, 185 (10th Dist.1995), quoting *Karat Gold Imports, Inc. v. United Parcel Serv., Inc.*, 62 Ohio App.3d 604, 611 (1989). Knowledge need not be actual; rather, the knowledge component of ratification also includes what the principal should have known. *Clear Creek Pshp. v. LeBeau*, 10th Dist. Franklin Nos. 97APE04-568 and 97APE04-569, 1998 WL 212859, *5 (Apr. 28, 1998). In addition, "[r]atification by the principal can be demonstrated by the retention of the benefits of the transaction." *Chevrolet v. Calhoun*, 10th Dist. Franklin No. 03AP-816, 2004-Ohio-1006, ¶ 19. With retention of the benefit comes retention of liability. *Rambacher v. Staton*, 4th Dist. Lawrence No. 1335, 1979 WL 206868, at *2 (Oct. 12, 1979) (citation omitted). Generally, whether ratification occurred is a question of fact. *See Bailey* at 185. However, if the facts establish each element and they are uncontested, ratification is a question of law. *Karat Gold Imports, Inc.* at 612 citing *Mountain States Waterbed*

*Distributors, Inc. v. O.N.C. Freight Systems Corp.*, 44 Colo.App. 433, 614 P.2d 906 (1980) and Annotation, 15 A.L.R.2d 807, 813 (1951).

**{¶68}** Significantly, Hanneman is unable to establish the elements of ratification in light of our decision to overrule Hanneman's first, second, third, and fifth assignments of error and cross-appellants' first and second cross assignment of error. Moreover, "Ohio does not recognize an independent cause of action for ratification". *McKee v. McCann*, 8th Dist. Cuyahoga No. 104956, 2017-Ohio-4072, ¶ 50. Therefore, we decline to address Hanneman's fourth assignment of error on the basis that it is rendered moot by our prior determinations. App.R. 12(A)(1)(c); *McKee. See MacDonald v. Webb Ins. Agency, Inc.*, 3d Dist. Allen No. 1-15-27, 2015-Ohio-4623, ¶ 41.

**{¶69}** Based on the foregoing, Hanneman's first, second, third, and fifth assignments of error and cross-appellants first and second cross assignments of error are overruled, and Hanneman's fourth assignment of error is rendered moot by those determinations. The judgment of the Allen County Common Pleas Court is affirmed.

***Judgment Affirmed***

**MILLER, J. and HENDRICKSON, J., concur.**

**Judge Robert A. Hendrickson from the Twelfth District Court of Appeals sitting by assignment of the Chief Justice of the Supreme Court of Ohio.**

**/jlr**